**15 MAG 673**

Approved: _____
A. DAMIAN WILLIAMS/MICHAEL FERRARA
Assistant United States Attorneys

Before:  HON. ANDREW J. PECK
         United States Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :    **SEALED COMPLAINT**

     - v. -                       :    Violations of 18 U.S.C.
                                       §§ 2, 1343 & 1621; 15
                                  :    U.S.C. §§ 78j(b) & 78ff;
GREGORY W. GRAY, JR.,             :    17 C.F.R. § 240.10b-5

            Defendant.            :    COUNTY OF OFFENSE:
                                       NEW YORK
- - - - - - - - - - - - - - - - x

                                       DOC #____/____

SOUTHERN DISTRICT OF NEW YORK, ss.:

        BEMPSEY G. CO, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation (the "FBI") and charges as follows:

## COUNT ONE
### (Securities Fraud)

        1.      From at least in or about April 2014 through in or about February 2015, GREGORY W. GRAY, JR., the defendant, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, as set forth above, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud, (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon investors, to wit, GRAY solicited $5 million from an investor based on false and misleading representations that he would use the money to purchase shares of Uber Technologies, Inc. when, in fact,

GRAY used the $5 million to purchase Twitter, Inc. stock and otherwise compensate investors who were owed money and/or stock by GRAY.

   (Title 15, United States Code, Sections 78j(b) and 78ff;
  Title 17, Code of Federal Regulations, Section 240.10b-5;
     Title 18, United States Code, Section 2.)

## COUNT TWO
### (Wire Fraud)

   2. From at least in or about April 2014 through in or about February 2015, in the Southern District of New York and elsewhere, GREGORY W. GRAY, JR., the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, GRAY solicited $5 million from an investor, by interstate wire and other means, based on false and misleading representations that he would use the money to purchase shares of Uber Technologies, Inc., when, in fact, GRAY used the $5 million to purchase Twitter, Inc. stock and otherwise compensate investors who were owed money and/or stock by GRAY.

   (Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Perjury)

   3. On or about February 24, 2015, in the Southern District of New York, GREGORY W. GRAY, JR., the defendant, having taken an oath before a competent officer and person, in a case in which a law of the United States authorized an oath to be administered, that he would testify, declare, depose, and certify truly, willfully and contrary to such oath, did state and subscribe to material matters which he did not believe to be true, to wit, GRAY, during sworn testimony before the U.S. Securities and Exchange Commission ("SEC"), gave the following false underlined testimony:

> Q: Did Late Stage Fund LP purchase 175,438 shares of common stock of Uber from [Seller-1]?

2

      (a)  A.  No.  The transaction never got done.  <u>It got ROFR'd away from us</u>.

      Q.  What does that mean?

      (b)  A. Right of first refusal.

                      * * *

      Q.  When did that happen, approximately?  It doesn't have to be exact.

      (c)  A. <u>October'ish, November'ish</u>.

      Q.  At the time when you are sending that to [Employee-1] in 2014, was it your understanding that you had entered into a stock transfer agreement to get Uber shares?

      (d)  A. <u>Yes</u>.

                      * * *

      Q.  But then -- so from your state of mind when you sent that to [Employee-1], you thought the subject matter is executed -- you thought you had a sale of shares, correct?

      (e)  A. <u>Yes</u>.

(Title 18, United States Code, Section 1621.)

    The bases for my knowledge and for the foregoing charges are, in part, as follows:

    4.  I have been a Special Agent with the FBI for approximately 12 years.  I am currently assigned to a squad within the FBI that is responsible for investigating violations of the federal securities laws, as well as wire, bank, and mail fraud laws and related offenses.  I have participated in numerous investigations of these offenses, and I have made and participated in making arrests of numerous individuals for participating in such offenses.

    5.  The information contained in this Complaint is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including, but not limited to: (a) business

records and other documents, including trading records, bank records, and records of electronic communications provided by various entities; (b) publicly available documents; (c) conversations with, and reports of interviews with, investors; (d) conversations with representatives from the United States Securities and Exchange Commission ("SEC"); and (e) a transcript of sworn testimony given by GREGORY W. GRAY, JR., the defendant, to the SEC. Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions and statements of and conversations with others are reported herein, they are reported in substance and in part. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

### Relevant Individuals and Entities

6. Based on my review of documents provided by Archipel Capital, LLC ("Archipel"), public records and sworn testimony given by GREGORY W. GRAY, JR., the defendant, and my interviews of witnesses, I have learned the following:

      a. Archipel is a venture capital firm founded by GRAY in or about 2005, with its principal place of business in Buffalo, New York. GRAY serves as Archipel's Senior Managing Director and owns 65.1% of Archipel's membership interests.

      b. Archipel's self-proclaimed mission is to provide non-institutional investors with the opportunity to access late-stage investments in privately held companies before those companies experience a liquidity event, such as a public offering or sale. From 2011 to the present, Archipel has raised over $19 million in capital from at least 140 individuals and entities.

      c. Archipel raises capital by selling partnership interests in investment vehicles, typically limited liability partnerships, created to pool investors' money and then purchase shares in a particular privately held company.

      d. At all times relevant to this Complaint, Archipel Capital - Bloom Energy LP ("Bloom Energy LP") was a limited partnership incorporated on or about February 24, 2012.

      e. At all times relevant to this Complaint, Archipel Capital - Social Media Fund LP ("Social Media Fund I") was a limited partnership incorporated on or about May 17, 2012

4

that raised approximately $2,396,618.99 from forty-six investors.

    f. At all times relevant to this Complaint, Archipel Capital - Social Media Fund II LP ("Social Media Fund II") was a limited partnership incorporated on or about September 11, 2013 that raised approximately $1,268,473.50 from one investor.

    g. At all times relevant to this Complaint, Archipel Capital - Social Media Fund 3 LP ("Social Media Fund III") was a limited partnership incorporated on or about March 20, 2014 that raised approximately $1,300,000 from two investors.

    h. At all times relevant to this Complaint, Archipel Capital - Social Media Fund 4 LP ("Social Media Fund IV") was a limited partnership incorporated on or about March 20, 2014 that raised approximately $275,000 from three investors.

    i. At all times relevant to this Complaint, Archipel Capital - Late Stage Fund LP ("Late Stage Fund LP") was a limited partnership incorporated on or about May 9, 2014.

    j. At all times relevant to this Complaint, Bloom Energy Corporation ("Bloom Energy") was a privately-held California-based alternative energy company.

    k. At all times relevant to this Complaint, Twitter, Inc. ("Twitter") was a California-based online social networking company. On or about November 6, 2013, Twitter's securities began trading under the symbol "TWTR" on the New York Stock Exchange ("NYSE"), which is based in New York, New York.

    l. At all times relevant to this Complaint, Uber Technologies, Inc. ("Uber") was a privately held, California-based transportation company.

    m. At all times relevant to this Complaint, Investor-1 was a business professional who invested in Bloom Energy LP and Social Media Fund III.

    n. At all times relevant to this Complaint, Investor-2 was an institutional investor that invested in Social Media Fund II.

o.  At all times relevant to this Complaint, Employee-1 was an employee of Investor-1.

p.  At all times relevant to this Complaint, Seller-1 was a former Bloom Energy employee.

### OVERVIEW OF THE SCHEME TO DEFRAUD

7.  As set forth below, there is probable cause to believe that GREGORY W. GRAY, JR., the defendant, obtained $5 million from Investor-1 based on false and misleading representations and then used the money to compensate investors whose money GRAY had mismanaged.  Specifically:

a.  From in or about June 2012 through in or about November 2013, GRAY raised approximately $5,240,000 for Social Media Fund I, Social Media Fund II, Social Media Fund III and Social Media Fund IV (collectively, the "Social Media Funds").  GRAY promised to use the capital to purchase shares of Twitter before the company's initial public offering ("IPO"). Based on GRAY's representations to investors, GRAY promised to purchase over 200,000 pre-IPO Twitter shares.

b.  GRAY frequently comingled funds between the various Archipel investment vehicles that he managed.  GRAY's withdrawals from the Social Media Funds left those funds with insufficient money to purchase the full complement of pre-IPO Twitter shares he had promised investors.

c.  On or about November 6, 2013, Twitter had its IPO and began trading on the NYSE.  At that time, contrary to his representations to investors, GRAY had purchased only 80,000 pre-IPO Twitter shares for a total cost of $1,875,000. GRAY accordingly owed his investors millions of dollars' worth of Twitter shares.

d.  In an attempt to make up the shortfall of Twitter stock, in or about April 2014, GRAY persuaded Investor-1 to invest $5 million in the Late Stage Fund which, according to GRAY, would purchase a purported multi-million dollar, privately held allotment of Uber shares.  Instead of using the $5 million to purchase Uber shares, GRAY used the money to make cash payments to investors in the Social Media Funds and to purchase post-IPO Twitter shares for those same investors.

e.  When Investor-1 requested documentation of the Late Stage Fund's purchase of Uber shares as promised, GRAY provided Investor-1 with a fabricated stock transfer agreement

6

that purported to show that the Late Stage Fund had purchased 175,438 Uber shares from Seller-1 (the "Uber Stock Transfer Agreement"). In truth and in fact, and as GRAY well knew, the Late Stage Fund had not purchased any Uber shares from Seller-1.

    f. On or about February 24, 2015, GRAY gave sworn testimony to the SEC. During his testimony, GRAY falsely stated, in substance and in part, that the Uber Stock Transfer Agreement reflected a bona fide purchase of Uber shares by the Late Stage Fund.

### GRAY SOLICITS FUNDS TO PURCHASE PRE-IPO TWITTER SHARES

    8. Based on my review of documents provided by investors and by Archipel, my review of electronic communications between investors and GREGORY W. GRAY, JR., the defendant, and my review of publicly available records, I have learned that:

    a. In or about June 2012, GRAY began to solicit investors for Social Media Fund I. According to the subscription documents, the fund planned to raise $5,500,000 that would "target investments in Twitter, Inc. and potential other social media companies." The subscription documents further explained that Archipel "has an opportunity to purchase shares of common stock" of Twitter "at a price per share not to exceed $26.00 . . . directly from certain existing shareholders of such [t]ransferred [s]hares[.]"

    b. GRAY portrayed Social Media Fund I to be Archipel's sole investment vehicle to purchase pre-IPO Twitter shares. In truth and in fact, however, as GRAY successfully solicited investors, GRAY created additional partnership vehicles. By in or about March 2014, GRAY had incorporated Social Media Fund II, Social Media Fund III and Social Media Fund IV.

    c. From in or about June 2012 through in or about November 2013, GRAY raised approximately $5,240,000 for the Social Media Funds. GRAY, in turn, promised investors that Archipel would purchase pre-IPO shares of Twitter at a price per share that would be as low as $19 but that in any event would not exceed $26. GRAY further represented in subscription documents that Social Media Fund I's "holdings . . . [would] reflect an overall acquisition price per Twitter Share not to exceed $20.00." Based on GRAY's oral and written representations to investors, GRAY obligated himself to use the $5,240,000 to purchase over 200,000 shares of Twitter.

7

9. Based on my review of trading records, bank records, public records, and documents provided by Archipel and other entities, I have learned that:

   a. In or about August 2012, GREGORY W. GRAY, JR., the defendant, caused Social Media Fund I to purchase 25,000 Twitter shares for $25.50 per share. The total purchase price was $637,500, plus $20,000 in associated fees. Although GRAY had raised sufficient funds to cover the purchase, he previously had transferred more than half of the funds out of Social Media Fund I's bank account.[1] Therefore, to help pay for the 25,000 Twitter shares, GRAY siphoned over $200,000 from other Archipel funds.

   b. In or about August 2013, GRAY caused Social Media Fund I to purchase 55,000 Twitter shares for $22.50 per share. The total purchase price was $1,237,500.

   c. Twitter's IPO took place on or about November 6, 2013. As of that date, GRAY had purchased only 80,000 pre-IPO Twitter shares, substantially less than the 200,000 shares he was obligated to purchase with his investors' money.[2]

   d. Twitter's IPO contained a "lock-up period" during which company insiders and other holders of pre-IPO shares were restricted from selling their shares on the public

---

[1] Based on my review of bank records and trading records, I have learned that between on or about June 27, 2012, and on or about August 1, 2012, GRAY transferred $350,000 from Social Media Fund I to other funds which GRAY controlled. GRAY then used that money to purchase stock for the benefit of investors in other Archipel funds that GRAY controlled.

[2] Between in or about June 2012, when GRAY established Social Media Fund I, and in or about November 2013, when Twitter had its IPO, GRAY had the opportunity to purchase additional Twitter shares. For instance, on or about November 27, 2012, GRAY executed a contract for Social Media Fund I to purchase 25,000 Twitter shares at $17 per share for a total purchase price of $425,000 (the "November 27, 2012 Stock Transfer Agreement"). However, although GRAY had raised $896,662.03 for Social Media Fund I by that date, Social Media Fund I's bank account balance was $26,228.50. The November 27, 2012 Stock Transfer Agreement was cancelled when Social Media Fund I failed to pay for the Twitter shares.

market. Twitter's lock-up period ended in or about May 2014. Accordingly, in or about May 2014, investors in the Social Media Funds began to insist that GRAY deliver their promised pre-IPO Twitter shares.

  e. In or about June 2014, GRAY began to distribute to investors the 80,000 pre-IPO Twitter shares that he successfully had obtained.

  f. In or about June 2014, Twitter's average closing price per share was $37.24. Accordingly, by June 2014, GRAY's investors reasonably expected their pre-IPO shares to yield a substantial profit if sold on the public market.

  g. Rather than inform his investors that he had failed to purchase sufficient pre-IPO Twitter shares, GRAY instead attempted to provide his investors with their expected profits by misappropriating funds from Investor-1, as explained below.

### GRAY MISAPPROPRIATES $5 MILLION TO COMPENSATE INVESTORS

  10. Based on my review of documents provided by investors and by Archipel, my review of electronic communications between investors and GREGORY W. GRAY, JR., the defendant, and my review of publicly available records, I have learned that:

  a. In or about April 2014, GRAY began to solicit investments in the Late Stage Fund, a new investment vehicle that, according to GRAY, would purchase privately held shares of Uber and other companies.

  b. As part of the scheme to defraud, GRAY successfully solicited $5 million from Investor-1, who previously had invested $1.2 million in Social Media Fund III, for the ostensible purpose of purchasing pre-IPO Twitter shares. Specifically, GRAY did the following:

   i. On or about April 21, 2014, GRAY sent an email to Employee-1, who worked for Investor-1. In the email, GRAY stated that "[w]e only have a $5[million] allocation of UBER -- which we will fill very quickly -- but I wanted to see if you and [Investor-1] had an interest before I spoke with our Institutional clients."

   ii. On or about May 27, 2014, GRAY sent another email to Employee-1. In the email, GRAY proposed that

9

Investor-1 "take the full $5[million] of UBER at a $6[billion] valuation -- then once the next UBER valuation is set (estimate is $12[billion]) we would sell [Investor-1] out at the $12[billion]." GRAY informed Employee-1 that GRAY needed Investor-1's $5 million investment by June 10, 2014. Finally, GRAY promised to return an "[e]stimated $10[million] to [Investor-1]" by "August 2014."

        11.    Based on my review of bank records, I have learned that on or about June 10, 2014, Investor-1 transferred, via wire, $5 million to the Late Stage Fund.

        12.    Based on my review of documents provided by Archipel, I have learned that on or about June 12, 2014, GREGORY W. GRAY, JR., the defendant, and Investor-1 executed a letter agreement for Investor-1's $5 million investment in the Late Stage Fund (the "Letter Agreement"). Under the terms of the Letter Agreement, the Late Stage Fund was obligated "to acquire at least 142,857 shares of UBER at a $35.00 per share price" within 21 days. Investor-1 faxed the Letter Agreement from Florida to GRAY's offices in Illinois.

        13.    From my investigation, including my review of trading records, bank records, and other documents obtained from investors and Archipel, I have learned that instead of using Investor-1's $5 million to purchase Uber shares as promised, GRAY used the funds in the following manner:

        a.    On or about June 23, 2014, GRAY transferred $2,129,366 from the Late Stage Fund to Investor-2, an institutional investor that had invested $1,268,473.50 in Social Media Fund II.

        b.    On or about June 27, 2014, GRAY transferred $1,185,000 back to Investor-1, a cash payment to compensate Investor-1 for Investor-1's $1.2 million Social Media Fund III investment.

        c.    From in or about June 2014 through in or about July 2014, GRAY improperly used a large portion of Investor-1's $5 million investment to purchase additional Twitter shares on the public market. GRAY then distributed the Twitter shares to investors in the Social Media Funds.[3] GRAY also made cash payments to investors in the Social Media Funds including Investor-1, who received a $1,264,500 cash payment in

---

[3] GRAY transferred 1,798 Twitter shares into his own personal account on or about November 26, 2014.

or about July 2014, thus making the total amount of money sent round trip from Investor-1 back to himself $2,449,500.

### GRAY FABRICATES AN UBER STOCK TRANSFER AGREEMENT

14. Based on my review of email correspondence between Employee-1 and GREGORY W. GRAY, JR., the defendant, I have learned that, in or about July 2014, Employee-1 began asking GRAY for documentation that the Late Stage Fund had purchased Uber shares for Investor-1, as promised. Instead of telling Employee-1 that he (GRAY) had not purchased any Uber shares, GRAY did the following:

   a. On or about August 8, 2014, GRAY sent Employee-1 the Uber Stock Transfer Agreement, which purported to be an executed stock transfer agreement, dated July 7, 2014, for the purchase of 175,438 shares of "Uber Technology Inc."[4]

   b. According to the Uber Stock Transfer Agreement, Seller-1, the former employee of Bloom Energy, was the purported seller of the Uber shares.

   c. The Uber Stock Transfer Agreement purported to be signed by Seller-1, Seller-1's wife, GRAY, and an Uber representative.

15. I have reviewed another stock transfer agreement that Seller-1 and Seller-1's wife signed in or about November 2013, transferring 25,132 shares of Bloom Energy stock to Bloom Energy LP (the "Bloom Energy Stock Transfer Agreement"). Based on my training, experience, familiarity with this case, and my comparison of the Bloom Energy Stock Transfer Agreement to the Uber Stock Transfer Agreement, I believe that GREGORY W. GRAY, JR., the defendant, fabricated the Uber Stock Transfer Agreement by copying the signatures of Seller-1 and Seller-1's wife from the Bloom Energy Stock Transfer Agreement and applying those signatures to the Uber Stock Transfer Agreement.

16. Based on my review of correspondence between the SEC and counsel for Uber, I have learned that Uber has no record of the Late Stage Fund, GREGORY W. GRAY, JR., the defendant, or Seller-1 ever owning Uber shares.

---

[4] In fact, the document misidentified Uber as "Uber Technology Inc." rather than Uber's real name, Uber Technologies Inc.

11

17. On or about February 25, 2015, I spoke with Seller-1, who informed me that he has never owned Uber shares and that therefore he could not have executed and did not execute an agreement to transfer Uber shares to any Archipel entity or employee.

### GRAY'S FALSE TESTIMONY BEFORE THE SEC

18. Based on my conversations with representatives of the SEC and my review of a transcript of testimony, I have learned that on or about February 24, 2015, GREGORY W. GRAY, JR., the defendant, provided testimony under oath before the SEC in Manhattan, New York. When asked about the Uber Stock Transfer Agreement, GRAY testified as follows:

> Q: Did Late Stage Fund LP purchase 175,438 shares of common stock of Uber from [Seller-1]?
>
> (a) A. No. The transaction never got done. It got ROFR'd away from us.
>
> Q. What does that mean?
>
> (b) A. Right of first refusal.
>
> \* \* \*
>
> Q. When did that happen, approximately? It doesn't have to be exact.
>
> (c) A. October'ish, November'ish.
>
> Q. At the time when you are sending [the Uber Stock Transfer Agreement] to [Employee-1] in 2014, was it your understanding that you had entered into a stock transfer agreement to get Uber shares?
>
> (d) A. Yes.
>
> \* \* \*
>
> Q. But then -- so from your state of mind when you sent that to [Employee-1], you thought the subject matter is executed -- you thought you had a sale of shares, correct?
>
> (e) A. Yes.

WHEREFORE, I respectfully request that an arrest warrant be issued for GREGORY W. GRAY, JR., the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

BEMPSEY G. CO
Special Agent
Federal Bureau of Investigation

Sworn to before me this
4th day of March 2015

HON. ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

13